IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | CRIMINAL CASE NO. |
| v. | 1:12-CR-115-SCJ-LTW |
| MARK YOUNG, | |
| Defendant. | |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

Pending before this Court is Defendant Mark Young's Motion to Suppress Statements. Docket Entry [45]. This Court convened a suppression hearing on September 7, 2012, Docket Entry [66], after which Defendant submitted a post-hearing brief in support of his Motion to Suppress Statements. Docket Entry [75]. The Government filed a response in opposition to Defendant's motion. Docket Entry [83]. Having considered Defendant's motion, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**. Docket Entry [45].

### 1. BACKGROUND

On April 10, 2012, the Grand Jury entered a four-count indictment against Defendant and a co-defendant for aiding and abetting each other to knowingly distribute explosive materials to a person who was not a licensee under federal law in violation of 18 U.S.C. §§ 842(a)(3)(B), 844(a) and 2; knowingly transporting, and causing to be

transported, explosive materials in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a); knowingly possessing a destructive device that was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5845(a)(2), 5861(d), and 5871; and knowingly transporting and causing to be transported, explosive materials in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a).

### A. Defendant's Arrest

On April 6, 2012, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") was involved in an investigation of the purchase of firearms and explosives. (Transcript of the September 7, 2012 Suppression Hearing ("Tr."), Docket Entry [66], 5, 10). Earlier during the investigation, an explosive device had been purchased from Defendant Young. (Tr. 5). As a result of that purchase, ATF Special Agent Bret Antwine secured an arrest warrant for Defendant. (Tr. 5). ATF agents arranged to meet and arrest Defendant outside of Cumberland Mall in Cobb County, Georgia. (Tr. 5, 50). When Defendant's vehicle entered the parking lot of Cumberland Mall, a police van[1] parked behind Defendant's vehicle to keep him from driving around the parking lot and injuring bystanders. (Tr. 6-7). Agents approached Defendant's vehicle on both sides and gave Defendant and his co-Defendant commands to put their hands up. (Tr. 8). After three or four commands, Defendant put his hands up and was then ordered to exit the vehicle. (Tr. 8). Special Agent Antwine, armed with his rifle in hand, gave loud

---

[1] There were also five marked police vehicles and at least one unmarked police vehicle present in the mall parking lot. (Tr. 9).

2

verbal commands. (Tr. 9, 11 ). Despite multiple orders to exit the vehicle, Defendant continued to sit in his vehicle. (Tr. 8-9). As a result of Defendant's failure to timely exit his vehicle, Special Agent Antwine opened the door, removed Defendant from the vehicle, and placed him on the ground beside his vehicle. (Tr. 9-10). Defendant was handcuffed and searched for weapons. (Tr. 10-11, 41). Defendant was asked if he had any weapons or explosives on him or in his vehicle. (Tr. 11). While still lying face down on the ground, Defendant responded that he had a gun under his driver's seat. (Tr. 11). Defendant's demeanor, when taken out of his vehicle, was quiet and reserved. (Tr. 11). Although Defendant appeared to be a little dazed, his response to Special Agent Antwine's question concerning the possession of weapons or explosives was clear, appropriate, and timely. (Tr. 12-13). Defendant was then placed in the police van. (Tr. 12-13). Approximately three to five minutes elapsed from the time officers pulled up to Defendant's vehicle until Defendant was placed in the police van. (Tr. 13).

While in the van, Defendant was read his Miranda rights by Task Force Officer ("TFO") William Munson. (Tr. 31). As TFO Munson read Defendant his Miranda rights, Defendant interrupted him and began reciting his rights from memory to TFO Munson. (Tr. 31-32). TFO Munson stopped Defendant and explained to him that even though he knew his Miranda rights he (TFO Munson) still had to read them off the card as required. (Tr. 32). TFO Munson continued reading Defendant his Miranda rights, and afterwards asked Defendant if he understood his rights or needed any of his rights

explained in further detail.² (Tr. 32). Defendant responded that he understood his rights. (Tr. 32). TFO Munson asked if Defendant still wished to speak to the agents without his lawyer present. (Tr. 32). Defendant responded "yes." (Tr. 32). When Defendant was given his Miranda rights, Defendant's demeanor was fine, a little shaken, yet coherent. (Tr. 35). TFO Munson's gun was holstered during the time that he was in the van with Defendant. (Tr. 38).

While in the van, Defendant asked TFO Munson to look at his abdomen because it was swollen. (Tr. 36). Defendant lifted his shirt and showed TFO Munson his abdomen, but did not ask for medical attention. (Tr. 36). TFO Munson did not say or do anything in response as Defendant was not bleeding and did not appear to be in pain. (Tr. 36). After reading Defendant his Miranda rights, TFO Munson waited for Special Agent Antwine to come into the van to question Defendant. (Id.). TFO Munson did not question Defendant. (Tr. 37). During questioning by Special Agent Antwine, TFO Munson reminded Defendant that he did not have to answer questions if he did not want to and that it would be better to be truthful and better not to answer than to lie. (Tr. 39). Defendant told Special Agent Antwine that he had cirrhosis of the liver. (Tr. 26). Special Agent Antwine asked Defendant if he needed to call an ambulance and Defendant said "no." (Tr. 26-27 ). Defendant did not appear to be in need of any immediate medical assistance. (Tr. 29). The agents left the Cumberland Mall parking

---

² TFO Munson read Defendant his Miranda rights from a pre-printed Miranda card that TFO Munson keeps in his wallet. (Tr. 32-34).

4

lot with Defendant and traveled to Defendant's residence, which was nearby. (Tr. 13). The time that elapsed from Defendant's arrest until the agents left the mall parking lot headed to Defendant's residence was approximately 30-40 minutes. (Tr. 13).

**B.     Defendant's Statements Provided During the Search of His Residence**

The agents transported Defendant to his residence, which was a short ride away and took less than ten minutes. (Tr. 29). Once at Defendant's residence, the agents executed a search warrant while Defendant remained in the van. (Tr. 38). ATF Special Agent Alan McLeod accompanied by other agents knocked on the door to the residence and for ten minutes explained to Defendant's parents why they were there with a search warrant. (Tr. 51-52, 57-58). Special Agent McLeod went over the search warrant with Defendant's parents, gave them a copy, informed them about what had previously transpired with their son, and then secured the residence. (Tr. 52, 58). In a normal tone, Special Agent McLeod also explained to Defendant's parents that Defendant had been compliant with everything, was non-confrontational, and informed them that they would be able to talk to him. (Tr. 58). Special Agent McLeod tried to be calm and easy when executing the search warrant. (Tr. 58). The execution of the search warrant lasted approximately one hour. (Tr. 58). After making sure the residence was secured and nobody else was there other than Defendant's parents, Special Agent McLeod went to the van to speak to Defendant. (Tr. 52-53). Defendant was sitting in the van with a cup of water and the air conditioner running. (Tr. 53). Defendant stayed in the van for approximately thirty minutes while the search warrant was being executed. (Tr. 38).

AO 72A
(Rev.8/82)

Midway through the search of Defendant's residence, Defendant was removed from the van by Special Agent McLeod. (Tr. 38). Defendant informed Special Agent McLeod that he needed to use the restroom. (Tr. 53). Defendant was uncuffed and escorted to the restroom. (Tr. 53). Ten minutes later, Defendant was taken back to the garage, seated in a chair, and given water. (Tr. 53). When Defendant was allowed to use the restroom, the agents were still searching the residence. (Tr. 53). At some point, while Defendant was in the garage, Defendant's mother asked if she could make him something to eat because he was taking medication for his liver and needed to keep food on his stomach. (Tr. 54). Defendant's mother made him something to eat, and Defendant was allowed to eat. (Tr. 54). Defendant had no other complaints and did not appear to be in pain or uncomfortable. (Tr. 54-55).

Prior to interviewing Defendant, Special Agent McLeod asked Defendant if he was read his Miranda warnings. (Tr. 55). Defendant responded yes, and indicated that TFO Munson read them to him. (Tr. 55). Special Agent McLeod asked Defendant if he still wished to talk to agents without an attorney present and Defendant stated he did. (Tr. 55). Special Agent McLeod also asked Defendant if he was under the influence of any drugs or alcohol and if he could clearly understand him. (Tr. 55). Special Agent McLeod clearly understood Defendant and noted that everything appeared to be normal. (Tr. 55). Defendant was extremely compliant and provided a detailed statement to the agents. (Tr. 56, 61). Defendant gave a statement to Special Agent McLeod detailing how he manufactured his own short barreled rifle, where he purchased the ingredients to make an explosive device, where remnant materials could be found around his room

AO 72A
(Rev.8/82)

or shed, where he made the explosive substance, who he was selling it to, why he was selling it, and the cost for the device. (Tr. 59, 65). Toward the end of the interview, Defendant began talking about extraneous things and had to be reeled back to the question at hand. (Tr. 60). When Special Agent McLeod questioned Defendant about a particular homemade explosive device, Defendant stated he did not want to talk about that. (Tr. 55). Defendant did not state that he did not want to talk anymore nor did Defendant state he did not want to talk without an attorney being present. (Tr. 55-56). Special Agent McLeod's tone when interviewing Defendant was normal, and his gun was holstered. (Tr. 56). Defendant and Special Agent McLeod went through a list of ten to fourteen firearms found in the house. (Tr. 56-57). Defendant informed Special Agent McLeod that one of the fourteen firearms seized belonged to his mother. (Tr. 57). The agents confirmed with Defendant's mother that the firearm was hers and left the firearm with her. (Tr. 57). At the conclusion of Defendant's interview, Defendant was cuffed, taken back to the van, and transported to booking. (Tr. 47, 59, 66).

## II. LEGAL ANALYSIS

Defendant seeks to suppress statements he made after he was arrested on April 6, 2012.[3] Specifically, Defendant argues the inculpatory statements made by him during his interrogation with Special Agent McLeod were involuntary and unintelligent. In support, Defendant contends that the police used coercive tactics (in light of his medical

---

[3] Defendant provided statements when he was arrested at the mall and after he was transported to his residence. Defendant is not seeking to suppress the statements provided before, during or after his arrest at Cumberland Mall. Instead, Defendant is seeking to suppress statements provided after he was transported and questioned at his residence by Special Agent McLeod.

7

condition of which they were aware) to badger him into uttering inculpatory statements. Defendant explains that these tactics included arresting him but unreasonably and unnecessarily delaying in bringing him to Court for his initial appearance, or to the police station for booking, wearing him down by further delay, and staging an interrogation at his parent's home to capitalize on the fragile emotional state of his elderly parents to secure his cooperation. In response, the Government argues Defendant's statements were voluntarily and intelligently made. This Court finds Defendant's arguments are without merit.

The Self-Incrimination Clause of the Fifth Amendment protects an accused from being compelled to testify against himself, or otherwise provide the state with evidence of a testimonial or communicative nature. Pennsylvania v. Muniz, 496 U.S. 582, 588-89 (1990). In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of custodial interrogations, certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Rhode Island v. Innis, 446 U.S. 291, 297 (1980). Miranda "warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal quotation marks and citations omitted). The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The waiver

AO 72A
(Rev.8/82)

inquiry is two-pronged. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009).

### A. Defendant Voluntarily, Knowingly and Intelligently Provided Statements to Arresting Officers and Agents

Here, the parties do not dispute that Defendant was arrested pursuant to an arrest warrant. There is also no dispute that Defendant was in custody at the time Special Agent McLeod questioned him on April 6, 2012, and therefore, the officers or agents were required to advise Defendant of his Miranda rights. Defendant appears to concede that TFO Munson advised him of his Miranda rights. Therefore, this Court must decide whether Defendant's waiver of his Miranda rights was voluntarily and intelligently made. Based on the credible testimony of the witnesses, Defendant's oral waiver of his Miranda rights meets both prongs of the waiver inquiry.

First, Defendant's waiver was voluntary. Defendant's statements to Special Agent McLeod after receiving the Miranda warnings were voluntarily provided. Although there is no evidence in the record about Defendant's education or intelligence, there is also nothing in the record to suggest that Defendant's lack of education and/or low

9

intelligence prevented him from understanding that he was voluntarily speaking to TFO Munson and Special Agent McLeod. Prior to interviewing Defendant, Special Agent McLeod asked Defendant if he was read his Miranda warnings. (Tr. 55). Defendant responded yes, and indicated that TFO Munson read them to him. (Tr. 55). Special Agent McLeod asked Defendant if he still wished to talk to agents without an attorney present and he stated he did. (Tr. 55). Special Agent McLeod also asked Defendant if he was under the influence of any drug or alcohol and if he could clearly understand him. (Tr. 55). Special Agent McLeod clearly understood Defendant and noted that everything appeared to be normal. (Tr. 55). Defendant was extremely compliant and provided a detailed statement to the agents. Defendant was not restrained when questioned by Special Agent McLeod. During Defendant's interview, the officers and agents' firearms were holstered, and none of the officers or agents threatened Defendant in any way. Other than unlocking Defendant's handcuffs and escorting him to the restroom, neither of the officers or agents had any physical contact with Defendant. There is no evidence of the use of physical punishment or violence towards Defendant. Additionally, there is no evidence that the additional officers agents on the scene were "surrounding or flanking" Defendant in a manner that was intimidating or threatening. Special Agent McLeod did not threaten Defendant and did not make any promises to Defendant in exchange for him speaking to them. See United States v. Teague, No. 2:10-cr-006-RWS-SSC, 2010 WL 6529640, at * 22 (N.D. Ga. Nov. 12, 2010) ("A statement is not given voluntarily if it is 'extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper

10

influence.'" (quoting Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989), cert. denied, 493 U.S. 1011 (1989)). Special Agent McLeod spoke in a normal tone while conducting the interview with Defendant. The entire interview in the garage lasted thirty minutes. (Tr. 65). At no time did Defendant request that the agents stop asking questions nor did Defendant indicate that he did not wish to answer any additional questions. When Special Agent McLeod inquired about a particular homemade explosive device, Defendant stated he did not want to talk about that incident. None of the agents or officers continued to question Defendant about any subject he did not want to talk about as part of the interview. Also illustrative of the nature of the interviews that day, Defendant was provided water to drink, allowed to sit in an air conditioned vehicle, and use the restroom. Moreover, Defendant's mother was allowed to prepare something for him to eat, and Defendant was allowed to eat.

Contrary to Defendant's argument, there were no coercive tactics used by the officers or agents present at either the mall or Defendant's residence to badger him into uttering inculpatory statements. The record is devoid of any evidence of intimidation or coercion on behalf of either TFO Munson or Special Agent McLeod, or any other agent or officer present. On arrival at Defendant's residence, Special Agent McLeod explained to Defendant's parents why they were there with a search warrant. (Tr. 51-52, 57-58). Special Agent McLeod spoke to Defendant's parents in a normal tone and was non-confrontational. (Tr. 58). Special Agent McLeod tried to be calm and easy when executing the search warrant. (Tr. 58). There is no evidence in the record that either the officers or agents tried to capitalize on the fragile emotional state of

11

Defendant's elderly parents in exchange for his statements.

Second, Defendant's waiver was knowing and intelligent. TFO Munson read Defendant his rights from a pre-printed <u>Miranda</u> card. (Tr. 32). Defendant recited his Miranda rights from memory, indicated his understanding of the waiver of his rights, and agreed to waive his rights. (Tr. 32). Defendant appeared to be in his right mind and in control of his faculties. (Tr. 35). TFO Munson's gun was holstered when he obtained Defendant's consent. (Tr. 38). Defendant was not under the influence of any drugs or alcohol, and he did not appear to be uncomfortable. (Tr. 36). Although Defendant informed TFO Munson that his abdomen was swollen, Defendant did not ask for medical attention, he was not bleeding, and he did not appear to be in pain. (Tr. 36).

When Defendant was transported to his residence, Special Agent McLeod asked Defendant if he was read his <u>Miranda</u> rights. (Tr. 55). Defendant said yes, and Special Agent McLeod asked Defendant if he still wished to talk to agents without an attorney present. (Tr. 55). After Defendant responded yes and waived his <u>Miranda</u> rights again, Special Agent McLeod also asked Defendant if he was under the influence of any drugs or alcohol and if he could clearly understand him. (Tr. 55). Defendant in a normal and compliant manner knowingly and intelligently gave a very detailed statement to the agents. (Tr. 56, 61). In fact, toward the end of the interview, Defendant began talking about extraneous things and had to be reeled back to the question at hand. (Tr. 60).

Considering the totality of the circumstances surrounding Special Agent McLeod's April 6, 2012 interview of Defendant, this Court concludes that Defendant's statements to Special Agent McLeod were made voluntarily, knowingly, and

12

intelligently. Indeed, Defendant demonstrated that he understood that his conversation with Special Agent McLeod was voluntary, knowingly, and intelligently made because Defendant promptly stated that he did not want to discuss a particular incident involving a homemade explosive device. (Tr. 55).

### B. Defendant's Inculpatory Statements Were Made Within Six Hours of His Arrest

This Court also rejects Defendant's contention that his presentment to a court or police precinct for booking was unreasonably and unnecessarily delayed. The McNabb–Mallory Rule "generally renders inadmissible, confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a)." Corley v. United States, 556 U.S. 303, 129 S. Ct. 1558 (2009) (alterations omitted). Congress codified the McNabb–Mallory Rule in 18 U.S.C. § 3501(c), which provides:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: provided, that the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c); see Corley, 556 U.S. at 322, 129 S.Ct. at 1571 (holding that § 3501(c) modified, but did not eliminate, the McNabb–Mallory Rule).

13

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure, relating to the initial appearance of defendants before a court, requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed. R. Civ. P. 5(a)(1). Rule 5(c) provides the procedure for an arrest occurring in a district other than the one where the offense occurred.

In this case, credible testimony revealed that Defendant's residence was only ten minutes away from a public area in the Cumberland Mall parking lot. Although Defendant was sitting in the police van for thirty minutes while his residence was being searched, the air conditioner was on, and Defendant was given food and water. The execution of the search warrant lasted approximately one hour, and Defendant's interview lasted only thirty minutes. (Tr. 66). In total, less than three hours elapsed from Defendant's arrest to his booking. (Tr. 13, 29, 28, 65). Because Defendant's confession occurred within six hours of his arrest, Defendant's confession was within the six- hour safe harbor provision of the statute.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED,** and these statements be **ADMITTED.** Docket Entry [45]. There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL.**

14

**SO ORDERED, REPORTED AND RECOMMENDED** this 9 ___ day of January, 2013.

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE